UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:21-CV-00078-JHM

JEROME K. ROBERTS                                                                                    PLAINTIFF

V.

HENDERSON COUNTY                                                                                  DEFENDANT

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Henderson County's Motion for Summary Judgment. [DN 22]. Fully briefed, this matter is ripe for decision. For the following reasons, the Defendant's Motion is **GRANTED.**

### I. BACKGROUND

The Plaintiff, Jerome Roberts ("Mr. Roberts"), is a convicted state inmate who was incarcerated at the Henderson County Detention Center ("HCDC") from December 2019 to August 2021. Mr. Roberts is a Muslim. [DN 1 at 4]. He claims that the Defendant, Henderson County, Kentucky ("Defendant"), interfered with his right to practice his religion. [*Id.*].

First, Mr. Roberts claims that Defendant interfered with the free exercise of his faith by denying him an Islamic prayer rug. [*Id.*]. Exactly fifty-two days after he entered HCDC, Mr. Roberts requested a prayer rug from the facility's staff. Following the Kentucky Department of Corrections' Religion Reference Manual ("KDOC manual"), [DN 22-7], HCDC staff gave Mr. Roberts a pink towel to use as his prayer rug. [DN 22-1 at 3]. They gave him a pink towel to differentiate it from the facility's white bathing towels, ensuring that neither Mr. Roberts nor another inmate would mistakenly use Mr. Roberts' religious item to shower. [*Id.*]. Mr. Roberts never complained about the towel until filing his lawsuit. [*Id.*]. But Mr. Roberts stated in his

Complaint that using the pink towel as a prayer rug was "unacceptable," and he gave multiple different reasons why it was unacceptable in his subsequent filings. [DN 1 at 4; DN 21 at 4; DN 24 at 2; DN 24-2 at 2]. The KDOC manual says inmates are allowed keep their own prayer towels as "personal religious items," and there is no record of Mr. Roberts ever attempting to procure his own prayer rug. [DN 22-7 at 2].

Mr. Roberts also complains that Defendant did not provide him with sufficient Islamic literature at HCDC. [DN 21 at 4]. He filed multiple requests with HCDC asking for "all literature you have on [the] Islamic faith," but the requests went unanswered. [DN 22-10]. Defendant asserts that the Quran and thirty-eight additional Islamic writings are available to inmates at any time for free via HCDC's electronic tablet system, [DN 22-1 at 4; DN 22-8; DN 22-11], but Mr. Roberts says that the writings are not truly accessible because the tablet system is unreliable. [DN 24 at 2; DN 24-2 at 2]. The KDOC manual says inmates are allowed to possess physical copies of the Quran and a summarized version of Hadith. [DN 22-7 at 3].

Mr. Roberts also made several complaints about the food he received while at HCDC. He alleges that the facility gave Muslim inmates observing Ramadan food that fell below "Federal health guidelines for caloric standards." [DN 1 at 4]. His Ramadan meals also did not include dates, raisins, or a substitute fruit for him to break his day-long fast with in the evening, as is encouraged by Islamic tradition. [*Id.*; DN 21 at 3]. Finally, Mr. Roberts states in the Complaint that he would miss at least two—and sometimes all three—meals during Ramadan because his meals were not delivered at the proper times. [DN 1 at 4]. He is certainly referring to HCDC staff not delivering his evening meal at promptly 7:45pm during Ramadan 2021 so he could break his fast immediately after his evening prayer; evening Ramadan meals were always delivered sometime after 8pm. [DN 21 at 3; DN 22-5]. While the incident is not in his Complaint, Mr.

2

Roberts could also be thinking of Ramadan 2020, when he was removed from the Ramadan meal list for accepting a lunch tray the day the fast began. [DN 22-1 at 2]. Before Ramadan that year, Mr. Roberts signed a form putting him on the Ramadan list, meaning HCDC would provide him with a morning meal before 5:00am and a double meal in the evening after 8:00pm from April 24 to May 23, 2020, so he could avoid eating during daylight hours in accordance with his religion. [*Id.*]. But Mr. Roberts was offered and accepted a meal tray at lunch on April 24, so pursuant to HCDC policy, he was immediately removed from the Ramadan list and was given standard, daylight-hours meals for the remainder of the fasting period. [*Id.*; DN 22-3]. Mr. Roberts claims he only accepted a tray due to a mix-up about which day Ramadan began that year and that he never intended to break his fast. [DN 24-1 at 5; DN 24-2 at 2–3]. He continued observing Ramadan and fasting during the day despite no longer receiving meals before dawn and after dusk. [DN 24-1 at 5].

Mr. Roberts filed a 42 U.S.C. § 1983 civil rights action with this Court *pro se* on August 2, 2021, asserting that Defendant violated his constitutional right to the free exercise of his religion. [DN 1]. After screening, the Court let his claims against defendant proceed, construing them to arise both under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1. [DN 10]. After discovery, Defendant filed its Motion for Summary Judgement. [DN 22].

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-movant must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

The fact that a plaintiff is *pro se* does not lessen his obligations under Rule 56. "The liberal treatment of pro se pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted). When opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a pro se litigant does not alter his duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment against a *pro se* plaintiff because he "failed to present any evidence to defeat the government's motion"). However, statements in a verified complaint that are based on personal knowledge may function as the equivalent of affidavit statements for purposes of

summary judgment. *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).

### III. APPLICABLE LAW

Mr. Roberts is suing a municipality. To prevail, he must prove that his rights were deprived pursuant to a government policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).

RLUIPA and the First Amendment have the same first two prongs. The first is whether the inmate's religious belief is sincerely held. *Holt v. Hobbs*, 574 U.S. 352, 361 (2015); *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1997). The second is whether the prison's rules place a "substantial burden" on the inmate's religious observance. 42 U.S.C. § 2000cc-1(a) (2000); *Hernandez v. C.I.R*, 490 U.S. 680, 699 (1989). The two laws then differ in their third prongs, namely the level of scrutiny courts apply to substantial burdens on sincerely held religious beliefs.

*A. Sincerely Held Religious Belief*

Under both the First Amendment and RLUIPA, an inmate must show that he sincerely believes that his religion requires the performance of the restricted practice. *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001); *Barhite v. Caruso*, 377 F. App'x 508, 510 (6th Cir. 2010). A person's internal religious convictions are an "intensely personal area," *United States v. Seeger*, 380 U.S. 163, 184 (1965), and the practice at issue must only be religious "in the person's own scheme of things." *Kent*, 821 F.2d at 1224. "Courts are to determine whether the line drawn by the plaintiff between conduct consistent and inconsistent with her or his religious beliefs reflects an honest conviction." *New Doe Child #1 v. Cong. of U.S.*, 891 F.3d 578, 586 (6th Cir. 2018) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014)) (internal quotation marks omitted). But Courts are not to question the truth or reasonableness of a person's sincerely held

5

religious beliefs, nor can they consider the centrality of a particular belief to a person's faith. *Hobby Lobby*, 573 U.S. at 725; *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014).

    B. *Substantial Burden*

The "substantial burden" standard is the same under both the First Amendment and RLUIPA. "Congress has cautioned that we are to interpret 'substantial burden' in line with the Supreme Court's 'Free Exercise' jurisprudence, which suggests that a 'substantial burden' is a difficult threshold to cross." *Living Water Church of God v. Charter Township of Meridian*, 258 F. App'x 729, 736 (6th Cir. 2007). To be substantial, the burden on the plaintiff's religious exercise must be more than a "mere inconvenience." *Id.* at 739 (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)). "[T]he Government substantially burdens an exercise of religion when it places substantial pressure on an adherent to modify his behavior and to violate his beliefs or effectively bars his sincere faith-based conduct." *New Doe Child #1*, 891 F.3d at 589 (quoting *Haight*, 763 F.3d at 565) (internal markings omitted).

    C. *Differing Third Prongs*

The First Amendment and RLUIPA differ in the level of scrutiny courts apply to regulations that substantially burden sincere religious beliefs. Under the First Amendment, if the prison's rules place a "substantial burden" on sincere religious observance, courts will uphold the rules if they are simply "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). But under RLUIPA, regulations that substantially burden sincere religious practice will only be upheld it they further compelling government interests and are the least restrictive means of furthering those interests. 42 U.S.C. § 2000cc-1(a). RLUIPA gives prisoners stronger religious protections than the First Amendment. *Holt*, 574 U.S. at 357. If a prison's regulations satisfy RLUIPA, they satisfy the First Amendment, but not the other way around.

## IV. DISCUSSION

*A. Timeliness*

Mr. Roberts filed his response to Defendant's Motion for Summary Judgment on October 3, 2022, a few days after the thirty-day deadline the Court gave him in its August 30 Order. [DN 23]. Defendant requests that the Court dismiss this action pursuant to said Order. [DN 25]. But the Federal Rules of Civil Procedure only authorize courts to impose "penalties [that] are just" for violations of case management orders. FED. R. CIV. P. 37.7. The Court finds that it would be unjust to dismiss a *pro se* prisoner's action at this stage just because he filed a few days late, causing little to no prejudice to the defendant.

*B. Recoverability Against Defendant*

In Section IV of his Complaint, the "Relief" section, Mr. Roberts did not fill out the parts reserved for compensatory damages or injunctive relief. [DN 1 at 6]. Instead, he requested monetary damages in the checkbox reserved for punitive damages and asked the Court to order Defendant to "Upgrade there (*sic*) guidelines to better fit Muslims" in the "other" relief box. [*Id.*].

Defendant submits that Mr. Roberts only requested punitive damages, and because punitive damages cannot be recovered from a municipality under § 1983, he has failed to state a claim. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); [DN 22-1 at 13–14]. But courts must liberally construe *pro se* litigants' pleadings. *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999). When stating his claims in Section III of his Complaint, Mr. Roberts stated that his purported inability to fully practice his religion at HCDC was "all pain and suffering, and emotional distress." [DN 1 at 4]. The Court construes this statement as a prayer for compensatory damages for the physical and emotional suffering Mr. Roberts experienced from being unable to fully live his faith.

[*See id.*]. While Defendant is correct that Mr. Roberts cannot recover punitive damages, he has sufficiently pleaded compensatory damages.

Defendant further argues that Mr. Roberts' request to change HCDC's guidelines is a request for injunctive relief, and because Mr. Roberts no longer resides at HCDC, that request is now moot. [DN 22-1 at 13–14]. Defendant is correct, and if Mr. Roberts has meritorious claims against Defendant, an injunction is no longer an available remedy. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) (holding that claim to enjoin improper search of legal mail was moot because prisoner no longer resided in the facility that searched his mail).

C. *Prayer Rug*

Mr. Roberts cannot bring prayer-rug claim because he did not exhaust his administrative remedies. Under the Prison Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a) (2013). The only exception is when there are no such remedies available. *Lamb v. Kendrick*, No. 21-3390, 2022 WL 14713620, at *4 (6th Cir. Oct. 26, 2022) (citing *Ross v. Blake*, 578 U.S. 632, 642 (2016)). Mr. Roberts provided an abundance of examples of him using HCDC's tablet system to file complaints with the facility about the other issues that gave rise to this suit, indicating that administrative remedies were available and that he was able to access them. [DN 24-1]. But he never made any complaint to HCDC about using a towel as a prayer rug before filing this lawsuit. [DN 22-1 at 3]. Mr. Roberts was obligated to notify HCDC of a problem and try to work it out with them internally before suing, and because he did not do so, he cannot bring this claim.

Even if Mr. Roberts exhausted his remedies, his First Amendment and RLUIPA claims would still fail because Defendant's policies did not burden his religious practice much at all in

8

this regard. HCDC follows the KDOC manual, which clearly says that inmates are allowed to keep their own prayer rugs as "personal religious items." [DN 22-1 at 3; DN 22-7 at 2]. The record does not show Mr. Roberts ever attempting to bring a prayer rug into HCDC, have someone outside the facility donate one to him, or otherwise acquire one from a source other than HCDC. He also does not allege that HCDC staff would have prevented him from acquiring his own prayer rug had he attempted to do so. He only complains that HCDC staff did not give him a formal prayer rug free of charge and implies that Defendant had an affirmative legal duty to do so. [*See* DN 1 at 4]. It did not. "RLUIPA does not require a [government] to pay for an inmate's devotional accessories." *Cutter v. Wilkinson*, 544 U.S. 709, 720 n.8 (2005); *see Moon v. Jordan*, No. 1:15-CV-167 RLW, 2017 WL 5466681, at *8 (E.D. Mo. Nov. 13, 2017) (holding that Muslim plaintiff had "no clearly established right to the Jail providing a prayer rug and that the denial of a prayer rug did not preclude his free exercise of religion"); *Woods v. Staton*, No. 3:15-CV-02169-PK, 2017 WL 3623835, at *12 (D. Or. June 2, 2017) (no RLUIPA violation because Muslim plaintiff "was not forbidden from possessing either a personal Quran or a prayer rug").

And even if HCDC did not allow any prayer rugs into the facility, other courts have held that a prison's First Amendment and RLUIPA obligations are satisfied if it provides a towel to use instead, which Mr. Roberts acknowledges HCDC did. *See Covington v. Cadogan*, No. 1:18-CV-511, 2019 WL 2949845, at *3 (S.D. Ohio July 9, 2019) (no First Amendment violation when prison only gave Muslim inmate towel to pray on even though facility banned formal prayer rugs); *Shepard v. Peryam*, 657 F. Supp. 2d 1331, 1352 (S.D. Fla. 2009) (same); *cf. Woods*, 2017 WL 3623835, at *12 (applying RLUIPA, a "brief delay in providing Woods with . . . an extra towel for use as a prayer rug [does not] constitute a substantial burden" on Muslim inmate's religious exercise). Mr. Roberts never faced any pressure to stop performing his daily prayers because of

9

Defendant's policies, so he did not endure a substantial burden. *See New Doe Child #1*, 891 F.3d at 589.

    D. *Islamic Literature*

On this issue, the Court finds that Mr. Roberts sincerely believes that he must engage with his faith's religious texts to fully practice Islam. His repeated messages to HCDC staff requesting Islamic literature demonstrate his efforts live out his stated beliefs and learn more about his faith. [*See* DN 24-1 at 3, 20]. Defendant has not presented any evidence showing that Mr. Roberts lacks a sincere belief on this issue.

But as is the case with the prayer rug issue, Mr. Roberts' claims fail because Defendant allowed Mr. Roberts access to a multitude of religious texts, so his religious rights were not burdened. The KDOC manual states that inmates are allowed keep personal copies of the Quran and a summarized Hadith (but not the multi-volume set) as "personal religious items." [DN 22-7 at 3]. As was the case with the prayer rug, Defendant does not have an affirmative legal obligation to give Mr. Roberts religious texts; they just cannot prevent him from acquiring them. *See Whitfield v. Libel*, No. 3:19-CV-692-JD-MGG, 2020 WL 758236 (N.D. Ind. Feb. 14, 2020) (citing *Cutter*, 544 U.S. at 720 n.8) (holding that correctional officers were not obligated by RLUIPA to use state resources to provide Muslim plaintiff with a Quran). The manual goes even further, saying that a Quran is available in the facility for inmate use. [DN 22-7 at 5]. At no point has Mr. Roberts claimed that he does not have access to the Quran. He only complains that he was not provided with all the Islamic literature that HCDC had when he asked for it. [DN 24-1 at 3, 20]. Finally, even if the Quran and thirty-eight other Islamic writings on HCDC's tablet system were all Mr. Roberts had access to, these were enough to satisfy Defendant's First Amendment and RLUIPA obligations. Having technical difficulties when using the tablet system is a "mere

inconvenience" on religious practice that does not give rise to a legal claim. *See Living Water Church*, 258 F. App'x at 739; [DN 24-2 at 2; DN 22-11].

Mr. Roberts appears to argue that the KDOC manual required Defendant to provide more than just the Quran to HCDC inmates. [*See* DN 24-2 at 2 ("They by the Defendants (*sic*) own admission only the Quran was their only Islamic literature required, this was not true and there (*sic*) own Exhibit 6, page 7, no. 7 first paragraph, shows it so.") (referencing DN 22-7 at 3)]. But Mr. Roberts misunderstands what the KDOC manual says. The manual's "personal religious items" section lists things inmates are allowed to have with them in the facility. [*See* DN 22-7 at 2–3]. It says that Mr. Roberts was allowed to possess both a personal Quran and Hadith, not that HCDC was required to give him both books. [*See id.*].

E. *Islamic Diet, Especially Lack of Dates or Fruit During Ramadan*

Firstly, Mr. Roberts claims that his Ramadan meals fell below federal guidelines for inmate caloric standards. [DN 1 at 4]. "A prisoner has a right under the Free Exercise Clause to a nutritious diet during Ramadan." *Pleasant-Bey v. Shelby County*, No. 18-6063, 2019 WL 11769343, at *6 (6th Cir. Nov. 7, 2019) (citing *Welch v. Spaulding*, 627 F. App'x 479, 483 (6th Cir. 2015)); *see Colvin v. Caruso*, 605 F.3d 282, 290 (6th Cir. 2010) (holding that prison officials must provide inmates with an adequate number of calories without violating their religious dietary restrictions). But Mr. Roberts has not provided any evidence to support this claim. He has made no showing as to how many calories were in his Ramadan meals or how many calories the guidelines said they were supposed to have. He did not even provide a general description of what his meals contained—besides not including fruit—or how they compared to non-Ramadan meals. Cases in this circuit that survived summary judgment did so because the plaintiffs proffered evidence that clearly described the meals they received and how they were nutritionally

11

inadequate. *See Pleasant-Bey*, 2019 WL 11769343, at *6; *Welch*, 627 F. App'x at 484 (affirming denial of summary judgment because Muslim plaintiff showed he only received 1,300 calories per day during Ramadan by tying "individual menu items to their respective caloric values"). All Mr. Roberts has provided is the conclusory claim that his meal calorie counts were below unspecified federal standards. [DN 1 at 4; DN 21 at 2]. Summary judgment must be granted here because Mr. Roberts has not made any showing on an essential element of his claim. *See Celotex*, 477 U.S. at 322.

The Court also holds that Mr. Roberts' rights were not deprived when HCDC staff did not deliver his Ramadan meals promptly at 7:45pm. [*See* DN 21 at 3]. While the Court finds that Mr. Roberts' belief as to necessity of eating immediately after his evening prayer is sincere (Defendant has offered nothing to dispute this), HCDC staff did not substantially burden his religious practice by bringing his evening meal as soon as fifteen minutes later. [*See* DN 22-5]. This was another "mere inconvenience" Mr. Roberts had to deal with as a prisoner, and his meals coming a bit later did not in any way bar him from participating in Ramadan. *See Living Water Church*, 258 F. App'x at 739; *New Doe Child #1*, 891 F.3d at 589.

Defendant also adamantly argues that Mr. Roberts' claim that the lack of fresh fruit in his Ramadan bags burdened his religious exercise is meritless. It urges that Mr. Roberts cannot possibly hold a sincere religious belief that his meals must contain fresh goods when he has previously consumed alcohol and illicit drugs and the snacks his friends bought for him from HCDC's commissary consisted almost entirely of junk food and possibly pork products (Mr. Roberts disputes the latter). [DN 22-1 at 6–7; DN 22-12; DN 22-14; DN 24 at 4]. It further asserts that HCDC's meals did not place a substantial burden on Mr. Roberts' religious practice because multiple courts have held that there is no substantial burden as long as the prison provides Muslims

12

with alternatives to unlawful foods; there is no duty to provide Muslims with any specific food item. [DN 22-1 at 11–12]; *see Turner v. Schofield*, No 1:15-CV-1135-JDT-egb, 2016 WL 3951218, at *29 (W.D. Tenn. July 20, 2016); *Cloyd v. Dulin*, No. 3:12-CV-1088, 2012 WL 5995234, at *12 (M.D. Tenn. Nov. 30, 2012).

If Mr. Roberts was only complaining about a general lack of healthy food at HCDC, the Court would quickly agree with Defendant for the above reasons. But the Court construes Mr. Roberts' filings to be arguing something more specific. It believes that Mr. Roberts wished for dates or similar fruits to be in his Ramadan bag so he could partake in the Islamic tradition of breaking the day-long fast every night by eating dates. This religious practice goes all the way back to the Prophet Muhammad, who broke his fast every Ramadan evening with three dates and cold water. *Scott v. Erdogan*, No. 3:CV-12-2041, 2015 WL 1405445, at *6 (M.D. Penn. March 25, 2015). The Court feels that Mr. Roberts holds a sincere desire to participate in this tradition, as its role in the Islamic faith has been attested to in multiple cases. *See, e.g., id.*; *Muhammad v. Jones*, No. 3:18-CV-212-BJD-JBT, 2022 WL 3162260 (M.D. Fla. March 30, 2022); *see also* Muslim News Staff, *Ramadan: Why You Need to Break Your Fast With Dates*, ISLAMIC BRIDGE (April 8, 2022), https://islamicbridge.com/2022/04/ramadan-why-you-need-to-break-your-fast-with-dates/ ("[I]t's a well-known tradition for Muslims to break their fast with dates.").

The Court is not persuaded Defendant's proffered evidence that Mr. Roberts lacked a sincere belief about this practice. None of it directly addresses date-eating. Even if, as Defendant asserts, Mr. Roberts consumed pork, alcohol, illicit drugs, and copious amounts of junk food, [DN 22-1 at 6–7], such actions are wholly irrelevant to whether Mr. Roberts believes he must break his Ramadan fast with dates. An inmate can sincerely adhere to one of his faith's practices but choose not to participate in others. *See Lovelace v. Lee*, 472 F.3d 174, 188 (4th Cir. 2006) (holding that

it was improper for prison to bar inmates who did not fast during Ramadan from participating in any Islamic religious services); *Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988) (stating that "a person [who] does not adhere steadfastly to every tenet of his faith" can still hold sincere beliefs on other tenets).

However, Mr. Roberts' claim fails for much the same reason his other claims have failed so far. Mr. Roberts does not allege that he was barred from eating dates inside HCDC; he merely states that he was not given any in his Ramadan sacks. [DN 21 at 3]. Again, Defendant does not have an affirmative duty to provide Mr. Roberts with everything he desires for his religious practice; instead, Mr. Roberts has a negative right to not have Defendant prevent him from practicing his religion. *See Cutter*, 544 U.S. at 720 n.8; *Scott*, 2015 WL 1405445, at *12 (no substantial burden when dates were available for purchase as an optional menu item). Mr. Roberts never alleged that he could not purchase dates or have his friends from outside the facility buy him some, like they did with other food items on numerous occasions. [DN 22-14]. Defendant did not provide any evidence that dates *were* available for purchase, but the burden was on Mr. Roberts to assert that they were *not* available to survive summary judgment. He had to show that he was not provided with dates *and* that he could not acquire them himself in order to prevail.

Mr. Roberts argues that the KDOC manual mandates that Muslim inmates have "fruit or a substitute" in their meals. [DN 24 at 2]. But he is mistaken. The manual excerpt Mr. Roberts provides simply includes "fresh or dried fruits" on a list of foods that are "definitely Halal (lawful)." [DN 24-1 at 1]. All this section does is inform prison staff that they will not run into any issues with Islamic dietary restrictions if they serve the listed foods, in contrast to the "Haram (unlawful)" foods that are listed above them. [*See id.*]. The manual does not contain any language mandating that Muslim inmates be served specific foods.

14

### F. Removal from the Ramadan List in 2020

Mr. Roberts did not mention his removal from HCDC's 2020 Ramadan list in his Complaint, only saying that "during Ramadan we miss 2 meals and sometimes 3 depending on what time they bring breakfast." [DN 1 at 4]. He did not directly address the incident until he filed his Response to Defendant's Motion for Summary Judgment. [DN 24 at 1]. While the Court must construe a *pro se* plaintiff's pleadings liberally, *Boswell*, 169 F.3d at 387, the Complaint's language is too vague for the Court to conclude that Mr. Roberts alleged that he was wrongfully removed from the Ramadan list due to one specific incident that has only now come to light. Because Mr. Roberts did not plead that he was wrongfully removed from the list, he "cannot now seek to raise new issues or otherwise amend [his] complaint in response to a motion for summary judgment," and the Court cannot consider the claim. *See Roller v. Fed. Nat. Mortg. Ass'n*, No. 12-CV-11236, 2015 WL 3823848, at *2 (E.D. Mich. June 19, 2015) (citing *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 787–788 (6th Cir. 2005)).

And even if the Court construed the Complaint so liberally as to effectively write in a claim for wrongful removal from the list, Mr. Roberts' claim would still fail because HCDC's Ramadan policy did not substantially burden his right to practice his religion. By its terms, every inmate was allowed to fully participate in the Ramadan fast until they themselves stopped participating by taking food during daytime. [*See* DN 22-2]. There is no burden at all on an inmate's right to fast unless he, through his own actions, stops fasting; only then is he no longer given Ramadan meals before sunrise and after sunset. [*Id.*]. Before his own actions indicated to HCDC a lack of adherence to Ramadan, Mr. Roberts faced no pressure to abandon the fast. *See New Doe Child #1*, 891 F.3d at 589. The Sixth Circuit has held that prisons can lawfully remove inmates from religious diets if they disobey the diet's terms, *Berryman v. Granholm*, 343 F. App'x 1, 5 (2009),

and district courts in this circuit have continued to hold that prisons can do this even after *Holt* clarified that RLUIPA is stricter than the First Amendment. *See, e.g., Meece v. Ballard*, No. 5:16-CV-114-TBR, 2016 WL 4536445, at *4–5 (W.D. Ky. Aug. 30, 2016). Further, courts applying RLUIPA have held that "[d]enial of participation [in] a special meal program does not constitute a substantial burden unless the removal or denial is permanent." *Miles v. Mich. Dep't of Corrs.*, No. 1:18-CV-352, 2019 WL 5273955, at *8 (W. D. Mich Aug. 1, 2019). Mr. Roberts' removal was not permanent; Defendant allowed him to participate in the Ramadan meal program the following year without issue. [DN 22-1 at 2]. The Court recognizes that HCDC's zero-tolerance policy of removing inmates from the Ramadan list for a single violation of the fast is incredibly harsh. Unfortunately, not all harsh policies are unlawful.

Although it is not binding authority, the Court feels it is appropriate to distinguish this case from the Fourth Circuit's *Lovelace* decision, the only federal appellate-level case about a Muslim inmate being removed from a Ramadan list. *Lovelace*, 472 F.3d at 174. In that case, a Muslim inmate was removed from his facility's Ramadan meal list for allegedly breaking the fast, much like Mr. Roberts. *Id.* at 183. The court denied the prison warden's motion for summary judgment on the inmate's official-capacity claim, holding that the prison's policy of removing inmates from the list for single instances of fast-breaking substantially burdened exercise of religion. *Id.* at 187. But the *Lovelace* inmate's removal carried steeper consequences than simply no longer receiving Ramadan meals. He was also barred from participating in *any* Islamic religious services for the remainder of Ramadan. *Id.* at 188. The court did not look kindly on the prison's apparent assumption that an inmate's nonparticipation in the Ramadan fast meant that the inmate also did not sincerely believe it important to attend religious services. *Id.* It held there was a substantial burden because the inmate was completely barred from attending religious services for weeks

16

because he allegedly broke a religious tenet that was unrelated to his desire to participate in religious services. *Id.* Unlike the *Lovelace* inmate, Mr. Roberts was barred only from the Ramadan fast and not any other activity after performing an act inconsistent with fasting. [DN 22-3].

## Conclusion

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, [DN 22], is **GRANTED**.

Joseph H. McKinley Jr., Senior Judge
United States District Court

November 2, 2022

cc:  Jerome Roberts, *pro se*
     Counsel of Record